# In the United States Court of Federal Claims

Bid Protest
No. 15-1351C
(Filed Under Seal: September 8, 2016 | Reissued: September 23, 2016)*

| | |
|---|---|
| MCCONNELL JONES LANIER & MURPHY LLP, )  )  )  ) Plaintiff, )  ) v. )  )  ) THE UNITED STATES OF AMERICA, )  ) Defendant. )  )  ) | Keywords: Bid Protests; 28 U.S.C. § 1491(b)(1); Judgment on the Administrative Record; Motion to Supplement the Administrative Record; Agency's Technical Evaluation; Cost Realism Analysis; FAR 15.305(a)(1); Best Value Determination. |

*Gail Lindsay Simmons*, Jackson Kelly, PLLC, Washington, DC, for Plaintiff. *Eric Whytsell* and *Hopewell H. Darneille III*, Jackson Kelly, PLLC, Of Counsel.

*Joshua D. Schnell*, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, for Defendant. *David R. Koeppel*, *Savannah L. Wilson*, and *Dennis A. Adelson*, Department of Labor, Office of the Solicitor, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

This post-award bid protest concerns a contract with the Department of Labor (DOL) to provide comprehensive support services for the Shriver Job Corps Center. After DOL awarded the contract to Alternative Perspective, Inc. (API), Plaintiff McConnell Jones Lanier & Murphy, LLP (MJLM), a disappointed offeror, filed this action. MJLM asserts that the agency improperly evaluated the technical aspects of the proposals, that it failed to conduct a proper cost realism analysis, and that its best value determination was unreasonable.

---

*This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions. In light of the parties' suggested redactions, filed on September 22, 2016, the Opinion is now reissued with redactions indicated by brackets.

Pending before the Court are the parties' cross-motions for judgment on the administrative record, as well as MJLM's Motion to Supplement the Administrative Record and the government's Motion to Strike. For the reasons set forth below, MJLM's Motion for Judgment on the Administrative Record is **DENIED**, and the government's cross-motion is **GRANTED**. In addition, the government's Motion to Strike is **DENIED** and MJLM's Motion to Supplement the Administrative Record is **GRANTED** for limited purposes, as set forth below.

## BACKGROUND

### I.   The Solicitation

#### A.   <u>The Request for Proposals</u>

DOL administers the Job Corps program to help "young people learn a career, earn a high school diploma or GED, and find and keep a good job." <u>See</u> <u>DOL</u>, Job Corps, www.jobcorps.gov (last visited September 8, 2016). The program operates 125 centers nationwide and serves over 60,000 students. <u>DOL</u>, Find a Job Corps Center, www.jobcorps.gov/centers.aspx (last visited September 8, 2016). Each center works to address barriers to employment by providing students with career development services that include "academic, career technical, career success and independent living skills, career readiness training, and support services." Administrative Record (AR) Tab 6 at 46.

On December 14, 2012, DOL issued a request for proposals (RFP) DOL12QA20003, which solicited proposals to operate the Shriver Job Corps Center (Shriver), located in Boston, Massachusetts. <u>Id.</u> at 42. The RFP was a small business set-aside that contemplated the award of a cost-plus-incentive-fee contract for a two-year base period with three one-year options. <u>Id.</u> at 63.

According to the Statement of Work contained in the solicitation, the contractor would "provide material, services, and all necessary personnel" to operate Shriver and serve approximately 272 residential students and 28 nonresidential students. <u>Id.</u> at 46–47. Specifically, the contractor would do the following:

(1) Provide academic, career technical, career success, employability, and independent living skills training.

(2) Provide health care, counseling, and other support services as needed.

(3) Conduct program operations in a setting that is clean, well maintained, and safe.

(4) Assist youth in obtaining employment, additional education or training, or entry into the Armed Forces.

(5) Provide support that prepares graduates to maintain long-term attachment to the labor market or further educational opportunities.

(6) Integrate center operations with the local workforce development systems, employers, the business community, and community-based organizations.

Id.

Offerors were instructed to submit a technical proposal, past performance information, a business management proposal, and a management capability review. Id. at 154–69. As relevant to this bid protest, the technical proposal was broken into two parts, a technical approach proposal and a staff resources proposal. Id. at 154, 157.

Pursuant to the RFP, an offeror's technical approach proposal would include the following, among other things: 1) methods for conducting outreach and establishing community partnerships; 2) admissions procedures; 3) strategies and methods for providing instruction and meeting the needs of students during the Career Preparation and Career Development Periods; 4) strategies to assist students in developing healthy lifestyles and to ensure a safe and healthy living and learning environment for students; and 5) methods/strategies for managing the Career Transition Period, to assist students in securing placement in their chosen fields. Id. at 154–57. Offerors were advised that in addressing these matters, they were to "demonstrate [their] understanding of the work and how [their] approach will meet the required outcomes and quality indicators specified in the [solicitation]." Id. at 154.

The staff resources proposal would consist of specified information such as organizational charts, staff schedules, position descriptions, resumes, identification of key personnel, an explanation of corporate services and support, a narrative detailing how staff would be developed, retained, and rewarded, and a transition/phase-out plan. Id. at 157–59. The RFP did not specify any particular number of staff (or "FTE") the contractor would be required to assign to the Center.

## B.       The RFP's Evaluation Criteria

Under the solicitation, the agency would consider four factors in its evaluation of the offerors' proposals, which were, in descending order of importance: 1) technical approach; 2) staff resources; 3) past performance; and 4) costs. This protest concerns the agency's evaluation of the first, second, and fourth evaluation factors. The third factor—past performance—is not at issue.

The RFP provided that both the technical approach and staff resources factors would be evaluated by a panel, which would assign to each of the factors either an exceptional, very good, satisfactory, marginal, or unsatisfactory rating. Id. at 172–73. The RFP specified that "all ratings are considered advisory only, and are not binding on the source selection official." Id. at 172.

The technical approach factor contained six subfactors, listed as follows in descending order of importance: 1) career development period; 2) career transition services; 3) career preparation period; 4) admissions; 5) outreach; and 6) administrative and management support services. Id. Tab 6b at 323.1–23.3. For each subfactor, the RFP provided that the agency's evaluation would be based upon: 1) the extent to which the proposal demonstrated an

"understanding of the work to be accomplished" and how that work will be performed in accordance with the Job Corps program's mission and policies; 2) how effectively the proposal recognized and tailored the programs "to operate in the context of the State's eligible population, and the local and regional labor market;" and 3) how effective the proposal was "in offering feasible strategies and methods to ensure the achievement of Job Corps' specified outcomes and quality indicators." Id.

The staffing resources factor contained the following six subfactors, which are also listed in descending order of importance: 1) adequacy of staffing; 2) corporate oversight and support; 3) proposed center director; 4) key personnel; 5) staff development and incentives; and 6) transition/phase out plan. Id. Tab 6b at 323.3–23.4. In general, the RFP stated that DOL would rate these subfactors based on the appropriateness, adequacy, and quality of the proposed staffing resources. Id.

The RFP provided that, in accordance with FAR 15.404-1, DOL would conduct a price analysis "to assess whether the price proposed is fair and reasonable." Id. at 323.5. "In addition," the RFP stated, "a cost realism analysis shall be performed to determine the probable cost of performance for each offeror." Id.; see FAR 15.404-1(d)(2). Under the RFP, and again consistent with the FAR, the agency's cost realism analysis would "reflect the [g]overnment's best estimate of the cost of a contract that is most likely to result from the Offeror's proposal." AR Tab 6b at 323.5; FAR 15.404-1(d)(2)(i). The RFP further stated that "[t]he [g]overnment shall determine the probable cost by adjusting each Offeror's proposed cost to reflect any additions or reductions in cost elements to realistic levels based on the results of the [g]overnment's cost realism analysis." AR Tab 6b at 323.5.

Finally, the RFP explained that DOL intended to award the contract to "the responsible Offeror whose proposal is responsive to the solicitation and is determined to be the best value to the [g]overnment." Id. Tab 6 at 178. "Selection of the best value," the RFP stated, "is determined through the process of evaluating the strengths and weaknesses of each Offeror's technical proposal in accordance with the evaluation criteria stated herein." Id. Specifically:

> In determining the best value, technical evaluation criteria are significantly more important than evaluated cost. The [g]overnment is more concerned with obtaining a superior technical proposal than making an award at the lowest evaluated cost. Thus, the closer or more similar in merit that the Offeror's technical proposals are evaluated to be; the more likely the valuated cost may be the determining factor in selection for award. However, the [g]overnment will not make an award at a premium it considers disproportionate to the benefits associated with the evaluated superiority of one technical proposal over another. Evaluated cost will not be adjectivally rated. The [g]overnment will assess whether the strengths and weaknesses between or among competing technical proposals indicate superiority from the standpoint of what the difference might mean in terms of expected performance and what the evaluated cost to the [g]overnment would be to take advantage of the difference.

Id.

## II.    Evaluation and Initial Award

### A.    Review by the Technical Evaluation Panel

DOL received proposals from six offerors in response to the RFP. Id. Tab 16 at 2749. The agency then convened a technical evaluation panel (TEP) to review the technical approach, staff resources, and performance factors and, consistent with the RFP's evaluation scheme, assign adjectival ratings to those factors. See id. Tab 24 at 3537. To that end, the TEP reviewed the proposals, identified their strengths and weaknesses, developed narrative descriptions of the proposals' technical aspects, and assigned adjectival ratings. See id. Tab 21a at 3167–92 (MJLM's TEP report); id. Tab 22a at 3315–36 (API's TEP report).

Based on the TEP's initial evaluation, the agency established a competitive range that included API and MJLM. Id. Tab 16 at 2766. The agency then held discussions with both offerors and received their final proposal revisions on June 16, 2015.[1] See id. Tab 60 at 6702. After reviewing the final proposals, the TEP found that both API's and MJLM's technical approaches merited an overall "very good" rating. Id. Tab 24 at 3540. The TEP awarded API a "very good" for its staff resources proposal, while MJLM received a "satisfactory" rating for that factor. Id. The breakdown of the TEP's adjectival ratings for each subfactor is as follows:

| Evaluation Factor/Subfactor | API | MJLM |
| --- | --- | --- |
| **Overall Technical Approach** | **Very Good** | **Very Good** |
| - Career Development Period | Very Good | Very Good |
| - Career Transition Services | Very Good | Satisfactory |
| - Career Preparation Services | Exceptional | Satisfactory |
| - Admissions | Very Good | Satisfactory |
| - Outreach | Very Good | Very Good |
| - Admin. & Mgmt. Services | Very Good | Very Good |
| **Overall Staff Resources** | **Very Good** | **Satisfactory** |
| - Adequacy of Staffing | Marginal | Satisfactory |
| - Corp. Support & Oversight | Very Good | Satisfactory |
| - Proposed Center Director | Very Good | Very Good |
| - Key Personnel | Very Good | Very Good |
| - Development & Incentives | Very Good | Satisfactory |
| - Transition Plan | Satisfactory | Satisfactory |

---

[1] The lengthy delay between the solicitation and the evaluation of the proposals was a result of a series of protests filed by the incumbent contractor. See Adams & Assocs., Inc. v. United States, 109 Fed. Cl. 340 (2013), aff'd, 741 F.3d 102 (Fed. Cir. 2014), reh'g en banc denied; Adams & Assocs., Inc., B-409680 et al., 2014 WL 1614214 (Comp. Gen. Apr. 22, 2014), reconsideration denied, B-409680.2 et al. (Comp. Gen. Nov. 12, 2014); Adams & Assocs., Inc. v. United States, 120 Fed. Cl. 250 (2015).

Id. at 3540–43; id. Tab 21a at 3187; id. Tab 22a at 3332–33.

**B.     Cost Realism Report**

As noted above, offerors were required to submit a business management proposal in response to the RFP. Id. Tab 6 at 161–67. These proposals were reviewed by a cost evaluator who compared the costs contained in the business management proposals submitted by API and MJLM to an independent government cost estimate (IGCE). Id. Tab 23c at 3425–96 (API Cost Evaluation); id. Tab 23e at 3499–3534 (MJLM Cost Evaluation). That estimate was "based primarily on historic prices paid for the operation of the Shriver Job Corps Center with modifications for Center and market trends." Id. Tab 60 at 6713 (Award Determination).

The cost evaluator concluded on the basis of her analysis that MJLM's cost proposal appeared reasonable to meet the contract goals. Id. Tab 23a at 3418. On the other hand, she found several "significant weaknesses" and some "deficiencies" in API's cost proposal. Id. Tab 23c at 3425–96; id. Tab 23a at 3418. As a result, she expressed concerns with API's ability to perform the contract at its proposed cost. Id. Tab 23a at 3418.

**C.     Review by the Contracting Officer and Initial Award**

Contracting Officer (CO) Vogt served as the source selection authority on the initial award. He reviewed the TEP's report, as well as API's and MJLM's past performance evaluations, and the cost realism report. He found that although "[b]oth API's and MJLM's overall technical proposals were rated as Very Good. . . . [T]he overall technical proposal of API [was] significantly stronger than MJLM." Id. Tab 24 at 3544. In reviewing the cost of each of the proposals, CO Vogt did not directly address the concerns raised by the cost evaluator about API's proposal. He found, however, that API's and MJLM's "proposed costs [were] realistic in their own right and no adjustments need[ed] to be made." Id. at 3545.

In light of API's stronger technical proposal and the fact that its cost was 1.5% lower than MJLM's, CO Vogt concluded that a "contract award to API is in the best interest of the government and [offers] the best value in terms of technical quality, staff experience, management and price." Id. at 3546. Accordingly, on June 30, 2015, the agency awarded API the contract. Id. Tab 26 at 3548.

**III.     GAO Protest and This Action**

**A.     Protest Before GAO**

On July 14, 2015, MJLM filed a bid protest with GAO. See McConnell Jones Lanier & Murphy, LLP, B-409681.3 et al., 2015 WL 6914575 (Comp. Gen. Oct. 21, 2015). MJLM alleged that the agency engaged in misleading discussions, improperly evaluated the offerors' technical proposals by favoring strategies characterized as "innovative" over proven approaches, improperly evaluated MJLM's past performance, conducted an improper organizational conflict of interest (OCI) evaluation, and made a selection that was tainted by bias. Id. at *3.

GAO found that MJLM's arguments "provide[d] no basis on which to sustain the protest." Id. It rejected MJLM's challenge to the agency's evaluation of the technical proposals, concluding that MJLM "fail[ed] to demonstrate that the evaluation was not in accord with the solicitation." Id. at *6. GAO also specifically addressed MJLM's argument that the agency improperly considered innovation as an unstated evaluation criterion. It found that "the agency's consideration of the innovations proposed . . . was consistent with the stated evaluation criteria" because "innovative approaches proposed by an offeror to accomplish a specified task logically relate[] to the effectiveness of the offeror's technical approach." Id. at *7.

### B.   This Action

On November 10, 2015, MJLM filed the instant bid protest in the Court of Federal Claims. See Compl., ECF No. 1. MJLM's original complaint raised many of the same arguments that it had raised unsuccessfully before GAO, including arguments that the agency failed to conduct a proper OCI evaluation, that the agency conducted misleading discussions with MJLM, that the agency improperly evaluated MJLM's past performance and technical proposals, and that, as a result of these failures, the agency's best-value analysis was flawed. See id. at 14–32.

In response to MJLM's complaint, the government filed a Notice of Corrective Action on December 15, 2015. ECF No. 24. The government stated in the Notice that DOL intended to conduct a new organizational conflict of interest evaluation, draft a new source-selection decision, and confirm or make a new award decision. Id. Upon the request of the government, the Court stayed the case for sixty days to permit the government to complete the corrective action. See Order, ECF No. 23. The Court subsequently extended the stay until April 15, 2016. ECF Nos. 27 and 29.

### C.   DOL's Corrective Action and New Award Decision

On April 15, 2016, the parties filed a joint status report notifying the Court that the agency had completed its corrective action. ECF No. 31. As a result of a new OCI investigation, the agency found that "neither MJLM nor API had an OCI by virtue of having obtained access to nonpublic information that was competitively useful." AR Tab 60 at 6700. CO Matz, the Chief of the Division of Job Corps Procurement, who was designated as the new source selection authority, issued a decision awarding the contract to API. Id. at 6699.[2] In the new award determination memo, CO Matz "largely affirmed the rationale" in the original award memo. Id. at 6700.

For purposes of the issues before the Court, the principal difference between the initial award decision and the award decision executed by CO Matz involved the treatment of the evaluator's cost realism analysis. In the original award decision, CO Vogt found both offerors' cost proposals reasonable and realistic without explicitly discussing the specific concerns the cost evaluator raised regarding API's proposal. See id. Tab 24. In the new decision memo, CO Matz "independently review[ed] both offerors' final revised business management proposals and

---

[2] During the course of the litigation, the original contracting officer was assigned to a new position at DOL. As a result, Ms. Matz, who was familiar with the procurement, stepped in to act as the CO and source selection authority. See AR Tab 60 at 6699–6700.

their respective evaluation[s]." Id. Tab 60 at 6700. Based upon that review, she rejected the cost evaluator's recommendations because, she concluded, the evaluator had "marked every deviation from the [IGCE] as an item of concern" and had recommended adjustments to those line items "without reference to the offeror's technical approach or other considerations." Id. at 6713. According to CO Matz, she "took a closer look and found that variations [from the IGCE] generally reflect[ed] the unique technical approaches of the offerors." Id. CO Matz accordingly concluded, in agreement with CO Vogt, that "the costs proposed by both MJLM and API were fair, reasonable, and realistic." Id. at 6715.

After reviewing the final proposals and the TEP's findings, CO Matz found that "API's Technical Proposal [was] significantly stronger than MJLM's." Id. at 6710. She also determined that "the difference in Cost between the two offerors did not serve as a significant discriminator." Id. at 6716. As a result, CO Matz concluded that "contract award to API is in the best interest of the [g]overnment and offers the best value in terms of technical approach, staff resources, past performance, and cost." Id. at 6717.

In light of the agency's corrective action, MJLM amended its complaint. See Am. Compl., ECF No. 39. In its amended complaint, MJLM alleges that the agency unreasonably evaluated the technical proposals submitted by MJLM and API, that it failed to conduct a proper cost realism analysis, and that, as a result, the agency's best value determination and award of the contract to API was arbitrary, capricious, and not supported by the record. See id.[3]

The government filed the administrative record on April 15, 2016, and the parties subsequently filed cross-motions for judgment on the administrative record. On August 17, 2016 the Court heard oral argument on those motions, as well as on the government's Motion to Strike the Declaration of Stephen Kilary (which MJLM submitted with its Response Brief), and MJLM's Motion to Supplement the Administrative Record with that declaration.

## DISCUSSION

## I.    Jurisdiction

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). A party is an "interested party" with standing to bring suit under 28 U.S.C. § 1491(b)(1) if the party "is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). A bidder has a direct economic interest if the alleged errors in the procurement caused it to suffer a competitive injury or prejudice. Myers Investigative & Sec.

---

[3] MJLM's amended complaint also alleged that the agency conducted misleading discussions that caused MJLM to increase its proposed price. See Am. Compl. ¶¶s 207–09. However, MJLM did not provide any support for this allegation in its motion for judgment on the administrative record. Because MJLM failed to develop this argument or provide any evidence that the agency conducted misleading discussions, the Court deems the argument waived. See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) (finding that "arguments not raised in the opening brief are waived").

Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing").

In a post-award bid protest, the protestor has suffered prejudice if it would have had a "'substantial chance'" of winning the award "but for the alleged error in the procurement process." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006). In other words, the protestor's chance of securing the award absent the alleged error "must not have been insubstantial." Info. Tech., 316 F.3d at 1319.

The government does not dispute that MJLM is an "interested party" in this case. MJLM was, of course, an actual offeror for the contract in question; and, as noted above, MJLM was the only other offeror in the competitive range for the award of the contract. See AR Tab 16 at 2766. MJLM challenges the agency's rationale for awarding the contract to API on a number of grounds which, if found meritorious, would require, at the least, a re-evaluation of the offerors' proposals. It follows, therefore, that MJLM had a substantial chance of winning the award but for the errors it alleges. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001) (finding standing where "the government would be obligated to rebid the contract, and [the protestor] could compete for the contract once again").

## II.     Standard for Granting Judgment on the Administrative Record

Pursuant to RCFC 52.1, the court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

## III.    Standard of Review in Bid Protest Cases

The court reviews challenges to a contract award under the same standards used to evaluate an agency action under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351. This "highly deferential" standard "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d

1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

In a bid protest action, the disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni Geom., 238 F.3d at 1338. And "the protestor's burden is greater in [a] negotiated procurement, as here, than in other types of bid protests because 'the contracting officer is entrusted with a relatively high degree of discretion.'" Glenn Defense Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)). Further, the court "accords contracting officers an even greater degree of discretion when the award is determined based on the best value to the agency." Glenn Defense, 720 F.3d at 908 (internal citations omitted); see also Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013); Galen Med. Assocs., 369 F.3d at 1330; Banknote Corp. of Am. Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); Advanced Data Concepts, 216 F.3d at 1058; E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 958–59 (Fed. Cir. 1993). In short, an agency's contract award is "least vulnerable to challenge" when it is based on a best-value determination. PlanetSpace Inc. v. United States, 96 Fed. Cl. 119, 125 (2010) (citing Galen Med. Assocs., 369 F.3d at 1330).

Given this highly deferential standard of review, the court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni, 238 F.3d at 1332–33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). To prevail, the agency need only articulate a "rational connection between the facts found and the choice made;" and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (quotations omitted). Thus, the agency's action is vulnerable to challenge only if the plaintiff can show that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ala. Aircraft Indus., Inc.–Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting State Farm, 463 U.S. at 43).

## IV.   Challenges to Evaluation of Technical Proposals

As described above, the technical proposals were evaluated with respect to two factors: technical approach and staffing resources. Based on the recommendations of the TEP, which the CO endorsed, both MJLM and API received overall ratings of "very good" on the technical approach factor. MJLM, however, received a "satisfactory" rating on three technical approach subfactors (career transition, career preparation, and admissions) for which API received higher ratings. With respect to the staff resources factor overall, API received a rating of "very good" and MJLM received a rating of "satisfactory." AR Tab 24 at 3540–43; id. Tab 21a at 3187; id. Tab 22a at 3332–33.

Based on her "review of the relative strengths and weaknesses identified [by the TEP], as well as the ratings provided, and the overall benefits offered by the offerors," CO Matz found that API's technical proposal was "significantly stronger than MJLM's." Id. Tab 60 at 6710. MJLM challenges this finding as well as the reasonableness of the ratings assigned to the technical approach and staffing resources factors. For the reasons set forth below, the Court finds MJLM's arguments unpersuasive.

A.      **Technical Approach**

MJLM poses several interrelated arguments to challenge the reasonableness of DOL's evaluation of the offerors' technical approach proposals. The gravamen of those arguments is that the adjectival ratings the agency assigned to the proposals (on both an overall and subfactor by subfactor basis) are presumptively unreasonable because the TEP identified a substantially greater number of strengths and several fewer weaknesses in MJLM's technical approach proposal than were identified in API's proposal. Pl.'s Opp'n to Def.'s Cross-Mot. for J. on the Admin. R. (Pl.'s Opp'n) at 16, ECF No. 56. MJLM contends that extra scrutiny of the ratings is warranted given what it views as a discrepancy between the raw number of strengths and weaknesses identified as to each proposal and the adjectival ratings assigned. MJLM suggests that these discrepancies occurred because DOL improperly used "innovation" as an "unstated evaluation criteria" that served as a "secret, magic key" to higher ratings. Id. at 12.

It is axiomatic that "[t]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." One Largo Metro, LLC v. United States, 109 Fed. Cl. 39, 74 (2013) (alteration in original) (quoting Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005)). "In particular, technical ranking decisions made by the agency are 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess.'" Textron, Inc. v. United States, 74 Fed. Cl. 277, 286 (2006) (quoting E.W. Bliss Co., 77 F.3d at 449), appeal dismissed sub nom. Textron, Inc. v. Ocean Tech. Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007); see also Elec. On-Ramp, Inc. v. United States, 120 Fed. Cl. 515, 522 (2015).

These principles suggest that absent a facial conflict between the adjectival ratings assigned and the narrative justifications the agency provided (or some other dramatic internal inconsistency, e.g., FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 377 (2011)), the Court must grant great deference to the decisions of agency experts as to whether a particular proposal's strengths and weaknesses support a "very good" rather than "satisfactory" rating, or an "exceptional" rather than "very good" rating.[4] This is particularly true where, as here, the RFP

---

[4] The court found such a dramatic inconsistency in FirstLine, where it observed that it could "not fathom how the [agency] would have reached the conclusion that the [protestor's] proposal was only 'moderately better' than the [awardee's] proposal" where the awardee's proposal had one strength and one weakness, while the protestor's had thirty-three strengths and no weaknesses. 100 Fed. Cl. at 377. For the reasons set forth in the text, there is no similar facial inconsistency in this case between the number of strengths assigned to each offeror's proposal, and the adjectival ratings assigned.

does not define what is required for a proposal to be rated "exceptional," "very good," "satisfactory," "marginal," or "unsatisfactory." See AR Tab 6 at 173.

The Court is not persuaded by MJLM's argument that increased scrutiny of the adjectival ratings assigned is warranted in light of MJLM's tally of the number of strengths and weaknesses the TEP identified for each offeror. First, it bears noting that neither the TEP nor the CO undertook the effort of counting the raw number of strengths and weaknesses assigned to each offeror's proposal.[5] That is not surprising given that, as even MJLM acknowledges, a simple comparison of the number of strengths or weaknesses identified in each proposal could not reasonably serve as the basis for determining either their adjectival ratings or relative value. See Pl.'s Opp'n at 15–16. The analysis to be undertaken under the RFP was a qualitative, not quantitative one. Thus, the RFP specified that DOL would "assess whether the strengths and weaknesses between or among competing technical proposals indicate superiority from the standpoint of what the difference might mean in terms of expected performance and what the evaluated cost to the [g]overnment would be to take advantage of the difference." AR Tab 6 at 178. And common sense counsels that the strengths and weaknesses identified in each proposal are not fungible—some strengths would be more important than others to the Shriver Center's success, and some weaknesses would pose greater risks.

Nor is it appropriate for the Court to second guess the weight the agency gave to the various strengths and weaknesses the TEP and CO Matz identified when they decided the adjectival ratings to be assigned to the technical approach factor and its component subfactors. The agency, not the Court, possesses the necessary expertise to determine the most effective strategies and methods for the successful operation of the Shriver Center. For that reason, the Court defers to the agency's exercise of its discretion to evaluate which strengths are most likely to lead to the achievement of the objectives and outcomes that DOL has set, and which weaknesses pose the greatest risks to the government.

In this case, the extensive narrative comments contained in the highly detailed TEP reports and the award decision provide ample support for the agency's assignment of an overall "very good" rating for both proposals, given that both proposals offered effective strategies to meet the goals of the solicitation, and that both proposals contained many strengths and very few weaknesses. AR Tab 21a at 3167; id. Tab 22a at 3315–32. Similarly, both the TEP report and the award decision provide ample explanation of the bases for the adjectival ratings assigned to the subfactors for each proposal and for the CO's ultimate decision that API's proposal was technically superior. See id. Tab 60 at 6710.

In that regard, the Court finds no merit to MJLM's argument that—to the extent that DOL gave higher ratings to API based on the fact that its proposal contained more innovative

---

[5] In fact, the government and MJLM have each done their own tallies of strengths and weaknesses which resulted in discrepant computations. MJLM claims that it counted 92 strengths and 8 weaknesses overall in API's technical approach, and 151 strengths and 4 weaknesses in MJLM's technical approach. Pl.'s Mot. at 10–11. The government, on the other hand, counted 121 strengths and 3 weaknesses for MJLM, and 76 strengths and 6 weaknesses for API. Def.'s Cross-Mot. at 15–16.

strategies and methods than did MJLM's—the agency employed an "unstated evaluation criteria," in violation of FAR 15.305(a). Pl.'s Mot. 11–16. Thus, the FAR requires agencies to "evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." FAR 15.305(a). An agency is prohibited from relying on "undisclosed evaluation criteria when evaluating proposals." Acra, Inc. v. United States, 44 Fed. Cl. 228, 293 (1999). However, the "solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." ACC Contr. Co., Inc. v. United States, 122 Fed. Cl. 663, 671–72 (2015) (quoting NEQ, LLC v. United States, 88 Fed. Cl. 38, 48 (2009)).

In this case, the RFP indicated that each offeror's proposal would be evaluated to determine how effective its strategies and methods would be "to ensure the achievement of Job Corps specified outcomes and quality indicators." AR Tab 6 at 173–75. MJLM argues that "'innovative' approaches and/or solutions are not reasonably and logically encompassed within the stated evaluation criteria" because the RFP emphasizes "successful performance;" accordingly, MJLM contends, the RFP "clearly favors proven strategies, staffing, and programs over 'innovative,' untested strategies, staffing, and programs." Id.

The Court disagrees. The dictionary defines "innovate" as to "bring in new methods, ideas, etc." Oxford English Reference Dictionary 726 (Rev. 2d Ed. 2002). As GAO observed when rejecting this very same argument, "innovative approaches proposed by an offeror to accomplish a specified task logically relate[] to the effectiveness of the offeror's technical approach." See McConnell Jones Lanier & Murphy, LLP, 2015 WL 6914575 at *7. And methods and ideas that are new (or "innovative") are not necessarily "untested" or unreliable. Indeed, in noting the innovative aspects of API's overall technical approach the TEP observed that there was "some evidence or documentation to support the likelihood that the ideas were feasible and would be effective in delivering outcomes and quality indicators." AR Tab 22a at 3315. The CO similarly noted that API had "provided evidence that demonstrated" that their proposed "innovative" strategies "had produced successful outcomes." Id. Tab 60 at 6706.

Further, it is certainly within the agency's discretion to decide that—in the interest of greater efficiency and the accomplishment of its goals—it will assign greater value to a proposal that contains new methods or strategies that appear promising to the agency, even if those methods and strategies have not yet been tested. And such a proposal might reasonably be viewed as more likely to lead to improved outcomes than a proposal that uses existing strategies and methods, even if those strategies and methods are "tried and true."

Nor does the agency's evaluation of the proposals reflect that undue weight was given to innovation as a basis for distinguishing API's proposal from MJLM's. In its discussion of MJLM's proposal, the TEP wrote that MJLM "primarily described" what the TEP characterized as a "well-performing approach" that was already in place at the Shriver Center. Id. Tab 21a at 3167. The TEP and the CO assigned MJLM an overall "very good" rating on its technical approach. Thus, the TEP (and the CO) did not discount the value of the "tried and true" approach represented by MJLM's proposal. They simply found API's proposal superior because, among

other reasons, it contained innovations that the agency apparently believed might enhance the Center's effectiveness.[6]

Finally, MJLM argues that, even if it was reasonable for the agency to consider the innovativeness of the technical approach proposals, DOL's consideration of the value of innovation to the offerors' proposals was "inconsistent, unreasonable, arbitrary, and capricious." Pl.'s Mot. at 17. MJLM points to the fact that the agency rated it as "satisfactory" on the career preparation period subfactor notwithstanding that the TEP identified a number of elements of MJLM's proposal which went above and beyond what was required by the Job Corps Policy and Requirements Handbook. Pl.'s Mot. 17–18. API, on the other hand, received an "exceptional" rating on this subfactor because the agency concluded that its proposal "was innovative, student-oriented, and went over and beyond the [g]overnment's requirements." AR Tab 22a at 3321. MJLM argues that the "only difference between the two proposals is the characterization of API's proposal as 'innovative' and 'student-oriented.'" Pl.'s Mot. at 18. But contrary to MJLM's argument, the panel did not simply characterize API's proposal with respect to the career preparation period as "innovative" and "student oriented;" it listed numerous specific learning strategies included in the proposal which justified the higher rating. AR Tab 22a at 3315.

MJLM also claims inconsistent treatment in the consideration of innovation with respect to the rating of the admissions subfactor. It points out that the panel gave MJLM a "satisfactory" rating for the subfactor and noted that MJLM did not "propose sufficient innovative approaches to support a higher rating." Pl.'s Mot. at 18; AR Tab 21a at 3171–72. MJLM complains that API's "admission" subfactor, on the other hand, was rated "very good," despite the fact that none of the TEP's comments noted any "innovative" approaches. Pl.'s Mot. at 18; AR Tab 22a at 3318. But notwithstanding the fact that API's admissions proposal was not characterized as "innovative," the panel report identifies a number of strengths in API's proposal that were not present in MJLM's and which could reasonably support a higher "very good" rating. AR Tab 22a at 3318 (noting "extensive Job Corps experience of proposed staff;" use of peer mentors; incentives for attainment of admissions goals; and other considerations).

In short, the record reflects that the agency gave careful consideration to each offeror's technical approach proposal and supplied a detailed explanation of the adjectival ratings it assigned to each proposal for each subfactor. Further, there was nothing improper about the agency attributing greater value to aspects of API's proposal that were innovative in nature. Given the high degree of deference afforded to an agency's evaluation of proposals for their technical quality, MJLM's arguments do not supply an adequate basis for this Court to overturn DOL's evaluation of the technical approach subfactor.

---

[6] MJLM also claims that "it remains unclear what criteria were used by DOL to determine which strategies were 'innovative'" given that the term was not defined in the RFP. Pl.'s Mot. at 21. It points to a strategy proposed by API which the agency described as "innovative" but which was "known to the Job Corps Community since February 2011." Id. at 22. It is plain to the Court, however, that an approach that was "known" in 2011 can still be considered innovative several years later if it had not been used before at the Shriver Center. And because it lacks the necessary expertise to do so, the Court declines MJLM's invitation to second guess the agency's characterization of particular methods and strategies as "innovative."

**B.    Staff Resources**

As noted, MJLM also challenges DOL's evaluation of API's technical proposal with respect to the staff resources factor. It asserts that the agency acted unreasonably when it assigned API a "very good" rating on staff resources, "despite its having been rated as only [m]arginal on the most important subfactor, Adequacy of Staffing." Pl.'s Mot. at 23. In addition, again relying upon the relative number of strengths and weaknesses assigned to each offeror's proposal, this time with respect to staff resources, MJLM argues that it was unreasonable, arbitrary, and capricious for the agency to assign it only a "satisfactory" rating while assigning API a higher "very good" rating. Id. at 26.

The Court finds these arguments unpersuasive. Thus, the TEP found that API's staff resources proposal "demonstrated a good understanding of the organization, qualifications, staffing and support needed to deliver the Job Corps Program." Id. Tab 22a at 3335. To support this conclusion, the report stated that "[a]ll proposed staff members appear[ed] to be well qualified and either met or exceeded position descriptions and [solicitation] requirements." Id. Further, based on numerous identified strengths, the TEP assigned API "very good" ratings as to four of the six staffing resources subfactors (corporate oversight and support; proposed center director; key personnel; and staff development and incentives).[7] Id. Tab 22a at 3333. Thus, the TEP report noted that API's President and COO each had over twenty years of Job Corps experience, that its proposed Center Director had fourteen years of Job Corps experience, and that its Chief Financial Officer had over thirty years of government contracting experience. Id. at 3344. The TEP also noted that all of the proposed key staff "had Job Corps experience and appeared to be well qualified for the positions for which they were proposed." Id. Additionally, the report identified as strengths aspects of API's proposal that provided for staff training, staff awards, and staff team building.

MJLM emphasizes, however, that the TEP found a weakness in API's proposal based on the fact that the total number of staff API proposed was "4.65 FTEs below the [IGCE]" Id. Tab 22a at 3335; see also id. at 3333 (identifying several "[m]ajor staff inconsistencies with the government's estimate" that were included in API's initial proposal, including among others that "total academic staffing" was 3 FTE lower than the estimate; a higher level of CTT staffing; and Medical/Dental staffing that was 1.275 FTEs below the IGCE). And, as MJLM notes, it was this discrepancy between the number of FTEs in API's proposal and the number in the government's estimate that apparently led the TEP to assign API a "marginal" rating with respect to the adequacy of staffing subfactor. Id. at 3333. MJLM argues that it was "flatly contradictory" for the agency to find that API demonstrated a "good understanding" of the staffing needed to support the Shriver Center notwithstanding that API received a "marginal" rating on the "adequacy of staffing" subfactor. Pl.'s Mot. at 24–25. It further argues that—in any event—the agency failed to adequately explain its basis for discounting the "marginal" rating assigned. Id.

---

[7] API received a satisfactory rating for the least important subfactor, "transition/phase out." AR Tab 22a at 3333.

The Court disagrees. First, notwithstanding the "marginal" rating assigned to the adequacy of staffing subfactor, API's proposed staffing levels were only 4.65 FTE lower than the government's estimate, or 126.05 FTEs as compared to the total government's estimate of 130.7 FTEs. CO Matz apparently considered this shortfall less significant than did the TEP. Compare AR Tab 22a at 3333 (TEP characterizes inconsistencies as "major"), with AR Tab 60 at 6710 (CO notes "some" inconsistencies between API proposal and government's estimate). And notably, the RFP did not require the offerors to propose any particular number of staff for the Center; nor did the agency provide its staffing estimate to the offerors. See AR Tab 60 at 6714.

Moreover, the Court rejects MJLM's argument that the agency failed to provide an explanation for why it assigned API an overall "very good" rating as to the staffing resources factor notwithstanding the "marginal" rating assigned to the adequacy of staffing resources subfactor. As noted above, an agency is only required to articulate a "rational connection between the facts found and the choice made" and the Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." State Farm, 463 U.S. at 43 (quotations omitted). In this case, the Court can discern from the TEP's report and CO Matz's award decision that API's overall rating of "very good" on the staffing resources factor was grounded in the "very good" ratings that the TEP assigned to four of the other five staffing resources subfactors and in the underlying strengths that supported those ratings. Further, the CO's award decision suggests that the agency ultimately concluded that the staffing discrepancies did not reflect an insufficient understanding of the solicitation's requirements, but rather a different technical approach to meeting them. See AR Tab 60 at 6713 (CO noting that she "took a closer look" where proposals "differed markedly from the [g]overnment's estimate" and found that "these variations generally reflect[ed] the unique technical approaches of the offerors, rather than insufficient understanding" of the solicitation requirements).

For reasons similar to those set forth above, the Court rejects MJLM's second argument that the ratings awarded to API and MJLM "run counter to the underlying technical evaluations, as evidenced by the number of strengths and weaknesses assigned to the two offerors." Pl.'s Mot. at 26–27. As described above, the raw number of strengths and weaknesses identified as to each proposal is not determinative of whether the adjectival ratings assigned are reasonable because not all strengths are equally valuable and not all weaknesses present the same risks. Thus, the fact that the TEP identified numerous strengths in MJLM's proposal and concluded that MJLM's staffing resources proposal demonstrated its understanding of the work and offered effective strategies to meet outcomes and objectives is not conclusive. See AR Tab 21a at 3187–91. Indeed, the TEP gave MJLM "satisfactory" ratings with respect to two of the subfactors (corporate oversight and support, and staff development and incentives) for which it had rated API "very good;" and this apparently resulted in a lower overall rating for MJLM of "satisfactory."

While neither the CO nor the panel set forth an explicit reason why MJLM received lower ratings for these subfactors, the Court notes that eight of the strengths assigned to MJLM's staff resources proposal involved what could just as easily been identified as a single strength— the use of staffing schedules that went beyond the requirements of the RFP. Id. at 3188–89. Further, the panel found a weakness in MJLM's proposal in that it was unclear how incentive earnings would be awarded. Id. at 3188. And while the TEP observed that staff training and

development under API's proposal exceeded the requirements of the Job Corps Handbook, id. Tab 22a at 3333; see also id. at 3334 (identifying proposed training needs assessment and training program proposed by API as a strength), MJLM's proposal merely adopted the incumbent contractor's existing training program. Id. Tab 21a at 3188. The TEP accordingly did not err when it concluded that "[c]onsidering the positive, but primarily tried and true responses and proposals, [MJLM's] overall rating for Staff Resources is Satisfactory." Id.[8]

In short, MJLM's challenges to the ratings assigned for the staff resources factor are unpersuasive for much the same reasons that the Court rejected MJLM's arguments with respect to the technical approach factor. Thus, the record reflects careful consideration of both offerors' staff resources proposals, detailed explanations of the adjectival ratings assigned, and a listing of what the agency saw as the strengths and weaknesses of each proposal. These determinations lie squarely within the expertise of the agency and the Court has no basis for second guessing them. Therefore, MJLM's challenge to the agency's finding that API's technical proposal provided greater benefits to the government than MJLM's technical proposal is without merit.

## V.      Challenge to Cost Realism Analysis

In addition to its challenge to the agency's evaluation of its technical proposal, MJLM contends that the agency did not conduct a proper cost realism analysis. It argues that CO Matz failed to adequately explain why she rejected the original cost evaluator's report; that CO Matz's own cost realism analysis was flawed; and that she erred by not adjusting API's costs upward to reflect additional staff included in the government's estimate. For the reasons set forth below, the Court finds that MJLM has failed to show that it was prejudiced by any alleged errors with respect to the cost realism analysis and that, in any event, MJLM's arguments lack merit.

### A.      Cost Realism Requirement

FAR 15.305(a)(1) provides that "[w]hen contracting on a cost-reimbursement basis, evaluations shall include a cost realism analysis to determine what the Government should realistically expect to pay for the proposed effort, the offeror's understanding of the work, and the offeror's ability to perform the contract." See also AR Tab 6 at 177 (RFP stating that the government would conduct a cost analysis to determine cost reasonableness and cost realism). Put another way, a cost realism analysis (frequently referred to as a "price realism" analysis), is used "to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique

---

[8] According to MJLM, CO Matz "ignored four and a half paragraphs" of the TEP Report describing MJLM's strengths, as evidenced by the fact that her award determination letter reproduced only the first portion of the TEP's evaluation summary of MJLM's Staff Resources strengths. Pl.'s Mot. at 29–31. The Court disagrees that CO Matz's failure to include a recitation of this information suggests that she ignored it. To the contrary, at the end of her truncated summary of the TEP's evaluation, she cross-referenced the entire report, see AR Tab 60 at 6710, as she did throughout her discussion of the technical proposals. Particularly given the presumption of good faith and regularity that is applicable here, see Info. Tech., 316 F.3d at 1323 n.2, the Court declines to infer that CO Matz ignored any part of the TEP report in conducting her evaluation.

methods of performance and materials described in the offeror's technical proposal." FAR 15.404-1(d)(1); <u>see also</u> <u>Afghan Am. Army Servs. Corp. v. United States</u>, 90 Fed. Cl. 341, 355 (2009).

Another purpose of the cost realism analysis is to determine "the probable cost of performance for each offeror," which "may differ from the proposed cost and should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal." FAR 15.404–1(d)(2)(i). The probable cost so determined is used for evaluation purposes to determine the best value. <u>Id.</u>; <u>see also</u> AR Tab 6 at 177 (RFP stating that "the [g]overnment shall determine the probable cost of performance for each offeror" and that "the [g]overnment shall determine the probable cost by adjusting each offeror's proposed cost to reflect any additions or reductions in cost elements to realistic levels based on the results of the [g]overnment's cost realism analysis").

B.     <u>**Scope of Review**</u>

It is well established that the "extent of a price realism analysis for each procurement can vary, and generally is within the discretion of the agency." <u>FCN, Inc. v. United States</u>, 115 Fed. Cl. 335, 375 (2014) (citations omitted); <u>see also</u> <u>Afghan Am. Army Servs.</u>, 90 Fed. Cl. at 357–58 (observing that "the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion . . . . [u]nless the agency commits itself to a particular methodology in a solicitation"); <u>Ceres Envtl. Servs., Inc. v. United States</u>, 97 Fed. Cl. 227, 303 (2011) ("The nature and extent of an agency's price realism analysis, as well as an assessment of potential risk associated with a proposed price, are matters within the agency's discretion."). Where, as here, the solicitation does not set forth a particular methodology for the cost realism analysis, the agency "enjoy[s] broad discretion" in conducting it. <u>Northeast Military Sales, Inc. v. United States</u>, 100 Fed. Cl. 103, 118 (2011) (internal quotations omitted); <u>see also</u> FAR 15.404-1 (stating that "the contracting officer is responsible for evaluating the reasonableness of the offered prices" and that "the complexity and circumstances of each acquisition should determine the level of detail of the analysis required").

In light of the broad discretion an agency possesses in determining methodology, the court's scope of review of an agency's cost realism determination is very narrow. To overturn the determination, "[a] plaintiff must establish that [the agency's decision] lacked a rational basis." <u>Westech Int'l, Inc. v. United States</u>, 79 Fed. Cl. 272, 286 (2007) (citing <u>JWK Int'l Corp. v. United States</u>, 49 Fed. Cl. 371, 393 (2001) and <u>CTA, Inc. v. United States</u>, 44 Fed. Cl. 684, 693 (1999)); <u>see also</u> <u>A-T Sols., Inc. v. United States</u>, 122 Fed. Cl. 170, 180 (2015) (observing that "the Court will not overturn a cost realism determination unless the plaintiff demonstrates the absence of a rational basis for the agency's decision"). As GAO observed in <u>Info. Ventures, Inc.</u>, "[a]n agency's cost realism analysis requires the exercise of informed judgment . . . . The analysis need not achieve scientific certainty; rather, the methodology employed must be reasonably adequate and provide some measure of confidence that the agency's conclusions about the most probable costs under an offeror's proposal are reasonable and realistic in view of other cost information reasonably available to the agency as of the time of its evaluation." B-

297276.2, et al., 2006 WL 587876 at *6 (Comp. Gen. Mar. 1, 2006).[9] In order to pass muster, it is therefore unnecessary "for an agency to demonstrate that a required cost realism analysis was conducted with 'impeccable rigor.'" A-T Sols., 122 Fed. Cl. at 180 (quoting OMV Med. Inc. v. United States, 219 F.3d 1337, 1344 (Fed. Cir. 2000)).

Of course, notwithstanding the highly deferential standard of review of cost realism determinations, "[t]he protestor's burden is not insurmountable." FCN, Inc., 115 Fed. Cl. at 376. Thus, "if an agency made irrational assumptions or crucial miscalculations, the court may find that the agency's price realism analysis lacked a rational basis." Id. (quoting Mil–Mar Century Corp. v. United States, 111 Fed. Cl. 508, 541 (2013) (internal quotations omitted)).

## C.    Motion to Supplement the Record

Before addressing the substance of MJLM's objections to the agency's cost realism analysis, the Court must address the extent to which MJLM can rely upon the Declaration of Stephen Kiraly in support of its arguments.[10] According to MJLM, "[t]he primary purpose of the Kiraly Declaration – and reason for its submission – is to help MJLM explain how the existing administrative record reveals the fatal shortcomings of the agency's cost realism analysis." Pl.'s Opp. to Def.'s Mot. to Strike at 4, ECF 62 (emphasis in original). Its "secondary purpose," MJLM states, "is to help demonstrate prejudice by presenting a quantitative analysis of the potential impact of DOL's failure to conduct a valid cost realism analysis." Id. at 4 n.3 (citing Kiraly Decl. ¶ 29).

"As a general rule, in determining whether an agency's actions are arbitrary or irrational, the 'focal point for judicial review [of the agency's decision] should be the administrative record already in existence, not some new record made initially in the reviewing court.'" Knowledge Connections, Inc. v. United States, 79 Fed. Cl. 750, 759 (2007) (alteration in original) (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985)). The purpose of this rule "is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard [applicable in bid protest cases] into effectively de novo review.'" Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)). Therefore, "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" Id. at 1380 (quoting Murakami, 46 Fed. Cl. at 735).

---

[9] Decisions of GAO are not binding on this court. See Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1084 (Fed. Cir. 2003). Nonetheless, given GAO's expertise in the technical aspects of the procurement process, such as cost realism analyses, its opinions are instructive and should be "prudently consider[ed]." Id.; see also Centech Group, Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009).

[10] MJLM submitted the declaration of Mr. Kiraly (whom it identifies as an expert consultant) when it filed its response brief. See Pl.'s Opp'n App. Ex. A, Kiraly Decl. (hereinafter, "Kiraly Decl."). The government subsequently moved to strike the declaration and MJLM then moved to supplement the record to include it. ECF Nos. 60, 62.

In light of these principles, MJLM will be permitted to supplement the record with Mr. Kiraly's declaration for limited purposes: to give the Court the benefit of his quantitative analysis of the impact of the errors the agency allegedly committed. See Kiraly Decl. ¶¶s 18–20, 26, 27, 29; FirstLine Transp. Sec., 100 Fed. Cl. at 372 (admitting expert's quantitative analysis of offerors' pricing information). Because the award decision speaks for itself, however, the Court will not consider Mr. Kiraly's declaration for purposes of addressing MJLM's argument that CO Matz did not conduct a line-by-line analysis of the costs in the offerors' proposals. See Kiraly Decl. ¶¶s 17, 22, 23, 24. Nor will the Court consider the declaration for purposes of deciding whether—absent such a line-by-line analysis—the CO's determination was invalid, because the question of whether a line-by-line analysis must be conducted in order for the Court to uphold the CO's determination is a legal one, not a technical one. For similar reasons, and because the Court is not reviewing the agency's decision de novo, it will not consider Mr. Kiraly's assertions regarding what documentation he would have provided had he performed a cost realism analysis. E.g., id. ¶ 25 (opining that given the "significant variances" the original cost evaluator identified, Mr. Kiraly "would have expected to see explanations of why those significant variances were ultimately determined to not require a [most probable cost] adjustment"). Finally the Court does not consider it appropriate to consider Mr. Kiraly's legal conclusions regarding whether the CO's analysis was compliant with the FAR and the RFP, id. ¶ 30, or whether any upward adjustment in API's costs would have resulted in a different source selection decision, id. ¶ 32.

Based on the foregoing, the Court will **GRANT** MJLM's Motion to Supplement the Administrative Record, for the limited purpose outlined above. The government's Motion to Strike, accordingly, is **DENIED**.

### D.    MJLM's Arguments

In this case, as described above, a government cost evaluator conducted an initial cost realism analysis by comparing the costs contained in the business management proposals submitted by API and MJLM to the IGCE. AR Tab 23c 3425–96 (API cost evaluation); id. Tab 23e 3499–3534 (MJLM cost evaluation). The cost evaluator concluded on the basis of her analysis that MJLM's cost proposal appeared reasonable to meet the contract goals. Id. Tab 23a at 3418. On the other hand, she found several "significant weaknesses" and some "deficiencies" in API's cost proposal and expressed concerns about API's ability to perform the contract at its proposed cost. Id. Tab 23c 3425–96; id. Tab 23a at 3418.

CO Matz found the cost evaluator's analysis and her conclusions flawed in several respects. In particular, she expressed concern that the evaluator had "marked every deviation from the [IGCE] as an item of concern" and had recommended adjustments to the line items for which deviations existed "without reference to the offeror's technical approach or other considerations." Id. Tab 60 at 6713. CO Matz concluded that "the issues identified by the cost evaluator were not truly problems with the proposals; rather, the majority of the issues identified were line items that differed from the [g]overnment's estimate in one way or another." Id. at 6714. In her view, these discrepancies reflected "the unique technical approaches of the offerors, rather than insufficient understanding of th[e RFP's] requirement[s]." Id. at 6713; see also id. at 6706 (observing that "the cost evaluator did not provide any rationale for her recommended cost

adjustments, which appear to be based solely on nonconformities with the [g]overnment's estimates").

Upon rejecting the cost evaluator's report on this basis (among others), CO Matz conducted her own review of the proposals. Based upon her review, she determined that no cost adjustments were warranted. Id. at 6713. She concluded that "both offerors' prices are fair and reasonable in light of the price competition for this requirement and with reference to the IGCE." Id.

MJLM contends that CO Matz failed to adequately explain why she rejected the cost evaluator's analysis. Pl.'s Mot. at 36. It further argues that the cost realism analysis CO Matz performed lacked validity because she did not adjust API's costs upward to reflect the difference between the staffing levels set forth in API's proposal and those contained in the government's estimate. Id. at 38. It also contends that CO Matz's conclusions were flawed because she allegedly did not conduct a line-by-line comparison of API's proposed costs to the line items in the IGCE, but instead relied upon a comparison of each offeror's total proposed cost to the total proposed cost in the government's estimate. Id. at 38–39. Finally, MJLM argues that to the extent that the CO did base her decision on line-by-line comparisons, she provided insufficient explanation for her ultimate conclusion that "the issues identified by the cost evaluator do not reflect defects, significant weaknesses, or weaknesses in the proposals or reasons to find the proposed prices other than reasonable and realistic." Id. at 38 (quoting AR Tab 60 at 6714).

### E.    Prejudice to MJLM

Before turning to the substance of MJLM's challenges to the agency's cost realism analysis, the Court addresses whether—even assuming their merit—MJLM would be entitled to relief. Thus, it is well-established that "[a] protester must show not simply a significant error in the procurement process, but also that the error was prejudicial, if it is to prevail in a bid protest." Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (citing Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). In that regard, "[a] party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract." Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (citing Bannum, Inc., 404 F.3d at 1358); Galen Med. Assocs., 369 F.3d at 1331; Info. Tech., 316 F.3d at 1319.

Here—even assuming that MJLM was correct that the CO's cost analysis was flawed—it cannot meet its burden of showing prejudice. Thus, according to MJLM, if the CO had accepted the cost evaluator's analysis in its entirety, the result would have been to require an upward adjustment in API's price of some $1.6 million and in MJLM's by $262,000. See Pl.'s Mot. at 44–45. In that case, MJLM's proposed costs over a five-year period would have been $629,000 less than API's (rather than $756,495 greater as the CO determined). Id.[11] But the value of the

_____

[11] Mr. Kiraly conducted his own analysis to determine what the upward adjustment in API's proposal would have been had the agency added the cost of 4.65 FTEs (to account for the weakness assigned API in its staffing resources proposal). He concluded that a $1.3 million

contract over the five-year period was close to $50 million, and price was the least important consideration in choosing the awardee under the RFP. AR Tab 6 at 178. The RFP, in fact, provides that the adjectival ratings for the technical evaluation criteria, when combined, are to be considered "significantly more important" than cost. Id.

Further, the CO's award determination memorandum makes it clear that a small price advantage in MJLM's favor would not have changed the result because the agency had determined that API's proposal was "significantly stronger than MJLM's." Id. Tab 60 at 6710.

As CO Matz explained:

> [T]he differences in Cost between the two offerors did not serve as a significant discriminator in my decision. Both offerors proposed costs that were determined to be fair, reasonable, and realistic. Even though API's proposed cost was 1.5% lower than the overall cost proposed by MJLM and 1% below the IGCE, I did not view that as a significant factor in the evaluation here since this is a cost reimbursement contract, so I viewed the two proposed costs as roughly equivalent, with API having just a slight edge for this factor.

Id. at 6716. Indeed, CO Matz stated that even "if API's costs had been adjusted to be higher than MJLM's probable cost, that would not have altered my best value determination." Id. at 6715.

In short, even assuming that the agency erred by not adjusting API's costs upward by as much as $1.6 million, as MJLM urges it should have done, MJLM has not demonstrated that it suffered prejudice. For that reason alone, MJLM's arguments based on the agency's cost realism analysis are unavailing.

**F.     Merits of MJLM's Challenge to the Cost Realism Analysis**

In any event, the Court finds MJLM's arguments regarding the validity of the CO's cost realism analysis unpersuasive. First, the Court rejects MJLM's argument that the CO did not adequately explain her decision to reject the cost evaluator's conclusions. To the contrary, CO Matz explained her disagreements with the cost evaluator's approach in detail, as set forth above. See id. 6713–16. Further, it was reasonable for the CO to fault the cost evaluator for failing to take into consideration the specific methods API proposed to employ in its operation of the Shriver Center. See FAR 15.404-1(d)(1) ("Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are . . . consistent with the unique methods of performance and materials described in the offeror's technical proposal.")(emphasis supplied); Alcazar Trades, Inc., B-410001.4 et al., 2015 WL 1813007, at *5 (Comp. Gen. Apr. 1, 2015) (finding that a "price realism evaluation must consider the unique technical approaches proposed

---

upward adjustment would be required, resulting in MJLM being the lowest priced offeror by some $487,000. Kiraly Decl. ¶ 29.

by each offeror" and "an agency may not mechanically apply its own estimates to an offeror's proposal without considering the offeror's unique approach").

For similar reasons, the Court finds no merit to MJLM's argument that the CO was required to adjust API's costs upward some $1.3 million to reflect 4.65 additional FTEs as contained in the IGCE. Pl.'s Mot. at 39–42; Kiraly Decl. ¶ 29. MJLM bases this contention on the fact that, as discussed in greater detail above, the technical evaluators assigned API a "marginal" rating on the adequacy of staffing subfactor. Pl.'s Mot. at 39–40. But notwithstanding the "marginal" rating, DOL assigned API's staffing resources proposal a "very good" rating overall and awarded the contract to API with full awareness that it proposed to staff the Center at a lower FTE level than was reflected in the government's estimate. Under these circumstances the agency was not required to adjust API's proposal upward; indeed, it would have arguably been inappropriate for it to do so. See Honeywell Tech. Sols., Inc., B–292354 et al., 2003 WL 24107764, at *7–*8 (Comp. Gen. Sept. 2, 2003) (cost evaluation was unreasonable where agency found that awardee was rated as "appropriate" under technical evaluation, yet also concluded that awardee had proposed insufficient staffing under cost realism analysis); see also A-T Sols., Inc., 122 Fed. Cl. at 180 (finding that "there is no basis for the Court to impose the so-called cost realism adjustment Plaintiff proposes" notwithstanding that staffing levels were below the [g]overnment's estimate, where "the Agency reasonably determined that they were not too low").

The Court is also not persuaded by MJLM's argument that the CO's cost realism analysis was irrational because she allegedly failed to conduct a line-by-line comparison of API's proposal to the IGCE. To begin with, when conducting a cost realism analysis, "agencies are not required to conduct an in-depth analysis or verify each and every item to a scientific certainty, but rather to perform a reasonable evaluation." Raytheon Tech. Servs. Co. LLC, B-406136 et al., 2012 WL 860811, at *4 (Comp. Gen. Feb. 15, 2012); see also L-3 Sys. Co., B-404671.2 et al., 2011 WL 1788634, at *7 (Comp. Gen. Apr. 8, 2011) ("[A]n agency is not required to verify each and every item in assessing cost realism; rather, the agency must perform a reasonable evaluation, which may, and should, include the informed judgments of the contracting agency."). In particular, because "[t]he depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion" a line-by-line analysis is not necessarily required when conducting a cost realism analysis. Symbion Power, LLC-Haytrac, B-405507 et al., 2011 WL 6091918, at *4 (Comp. Gen. Nov. 16, 2011) (rejecting the argument that agency's price analysis was flawed because it did not conduct line-by-line analyses of offerors' prices) (citing Computer Sys. Int'l, Inc., B–276955 et al., 1997 WL 464009 (Comp. Gen. Aug. 13, 1997)).

Further, contrary to MJLM's argument, the record demonstrates that when the CO conducted her own review of the costs proposed by the offerors, she did not rely exclusively on a bottom line comparison of API's proposal, MJLM's proposal, and the IGCE. To be sure, she properly found that such a bottom line comparison was hardly irrelevant, recognizing that "despite some significant variances in certain line items, the offerors' proposed base period costs were less than $[ . . . ] apart (or approximately [ . . . ]%) as well as just 2.7% below (API) and

[ . . . ]% above (MJLM) the IGCE." AR Tab 60 at 6713.[12] But she explicitly noted that she had also conducted an in-depth review of the line item costs in API's proposal and their variances with the line items in the government's estimate. She explained that "[w]here certain line items differed markedly from the [IGCE], I took a closer look and found that these variations generally reflect[ed] the unique technical approaches of the offerors, rather than insufficient understanding of this requirement." Id.

Based on these considerations, as well as the fact that the differences between the offerors' overall proposed costs were relatively slight, the CO concluded that "the costs proposed by both MJLM and API were fair, reasonable, and realistic." Id. at 6715. Moreover, she declined to "find fault with the proposals for their divergence from the [g]overnment's estimate on specific line items or minor inconsistencies with how they account for specific costs." Id. She found that the proposed prices were "not unreasonably low so as to present a risk to the [g]overnment" and that each offeror's proposed costs should be treated as its "probable cost" and used for the best value determination. Id. at 6713.

MJLM's criticisms of the CO's analysis as insufficiently precise are also unavailing. As noted above, the Court's standard of review of agency cost realism analyses does not require such analyses to reflect "impeccable rigor." In this case, the record reflects that CO Matz made "a good faith effort to consider material facts that a reasonably prudent person would consider relevant to the procurement decision," and that her decision was not "'tainted by irrational assumptions or critical miscalculations.'" United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 330 (2002) (quoting OMV Med. Inc., 219 F.3d at 1344).

Thus, when CO Matz reviewed the offerors' cost proposals, she compared them to the IGCE and examined the reasons for the line item deviations the evaluator identified as problematic. She determined that the discrepancies were either minor or based on the offeror's particular technical approach. She based her conclusions as to whether the discrepancies justified an upward adjustment in costs on her considerable experience regarding the operation of Job Corps Centers and the fact that, at the bottom line, the costs proposed did not diverge significantly from the government's estimates. The Court is satisfied that the award decision contains sufficient explanation to establish a rational connection between the record before the CO and the conclusions she reached regarding whether the costs proposed by the offerors were reasonable and realistic.

Finally, the Court addresses what MJLM calls "a number of glaring factual errors and inconsistencies" that it says "severely undercut DOL's claim that a true cost realism analysis was performed or that the cost realism analysis, if performed, is entitled to deference." Pl.'s Opp'n at 4. The first of these is that the award determination memorandum includes two IGCE amounts—$50,102,872 and $50,606,375—that are different than the $49,137,698 sum that Mr. Kiraly

---

[12] This summary of the differences between the proposals is not entirely accurate. According to the CO, MJLM's proposed base period costs were $[ . . . ] and API's proposed base period costs were $[ . . . ]. AR Tab 60 at 6713. Therefore, the difference between the proposals was  $[ . . . ], not "less than $81,000." Nonetheless, the CO was correct that the proposals were approximately [ . . . ]% apart.

found represented the total IGCE. See id. at 4–5; compare AR Tab 60 at 6701; 6705 with AR Tab 5 at 40–40.1; Kiraly Decl. ¶ 19. In response, the government asserts that "the contracting officer has represented" that her cost realism analysis relied on the $49,137,698 amount and not the incorrect amounts set forth in her award determination memorandum. Def.'s Reply to Pl.'s Opp'n to Def.'s Cross-Mot. at 4–5, ECF No 61. It claims that the record supports this conclusion because CO Matz determined that API's proposed base costs were 2.7% below the IGCE while MJLM's costs were [ . . . ]% above the IGCE. See id. (citing AR Tab 60 at 6713).

The Court agrees that the record supports the government's representation that CO Matz did not rely upon either of the totals set forth in the award memorandum ($50,102,872 and $50,606,375). If she had used these incorrect figures, then she would not have characterized MJLM's proposed costs as being above the government's estimate during the base years. On the other hand, the government's argument that she actually used $49,137,698 as the applicable government estimate, is consistent with both her statement that MJLM's proposal for the base years was above the estimate, and her finding that API's was below, as stated in her award decision. Therefore, the Court finds her incorrect citations of the $50,102,872 and $50,606,375 amounts in her award decision were de minimis errors that do not affect the outcome of this protest. See Glenn Def., 720 F.3d at 907 (finding that "[d]e minimis errors in the procurement process do not justify relief" (citing Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996))).

Second, MJLM asserts that the contracting officer's cost realism analysis did not consider costs related to outreach and admissions or career transition services because those costs are not reflected in certain cost realism analysis spreadsheets that are in the record. See Kiraly Decl. ¶ 20 (citing AR Tab 21(d)(ii), Tab 22(b)(ii)). But notwithstanding the content of these two spreadsheets, the costs of outreach and admissions and the costs of career transition services are included in the offerors' business proposals, e.g., AR Tab 7c at 908–31; id. Tab 8C at 1381–1451, and in the cost evaluator's evaluation sheets, id. Tab 21c at 3254–59; id. Tab 22b at 3385–86. In addition, the award decision reflects the contracting officer's consideration of the offerors' proposed costs for outreach and admissions and career transition services in her review of the cost evaluation. See id. Tab 60 at 6714 (referring to "Line 4" for "Media Advertising Expenses" and referring to MJLM's proposal to open six offices).

Lastly, MJLM correctly notes that a sentence in the award determination memorandum inaccurately describes the cost evaluator's conclusions about API's cost proposal. See Pl.'s Opp'n at 5–6. That sentence states as follows: "Although the cost evaluator identified some concerns, she concluded – and as the contracting officer and Source Selection Authority, I confirmed – that both offerors' proposed costs were reasonable and realistic." AR Tab 60 at 6705–06. In fact, as MJLM correctly notes, the cost evaluator did not conclude that API's proposed costs were reasonable and realistic. But the award decision in its entirety makes clear that the CO understood that the cost evaluator had taken issue with a number of the line items in API's proposal and found them unreasonable. This errant sentence, accordingly, does not undermine the rationality of the CO's cost realism analysis or suggest that DOL failed to conduct a "true cost realism analysis," as MJLM asserts.

**VI.     Best Value Determination**

MJLM's final argument is that the agency's best value determination "was seriously flawed based upon all of the errors discussed above, which permeated its Technical Approach, Staff Resources, and Cost Realism analyses." Pl.'s Mot. at 46. In short, MJLM asserts, "a best value award determination based upon erroneous information is unreasonable." Id.

For the reasons set forth above, the Court has concluded that DOL acted reasonably and within its discretion in its review and evaluation of both API's and MJLM's technical proposals, that it provided a reasonable explanation for its cost realism analysis, and that, in any event, MJLM was not prejudiced by any error with respect to the cost realism analysis. Accordingly, MJLM's challenge to the agency's best value determination cannot be sustained.

## CONCLUSION

For the reasons discussed above, the government's Cross-Motion for Judgment on the Administrative Record is **GRANTED**, and MJLM's Motion for Judgment on the Administrative Record is **DENIED**. The Clerk of the Court is directed to enter judgment accordingly. In addition, MJLM's Motion to Supplement the Administrative Record is **GRANTED**, for the limited purposes outlined above, and the government's Motion to Strike is **DENIED**.

Pursuant to the Court's November 12, 2015 Protective Order, this Opinion and Order has been issued under seal. The parties shall have two weeks to propose redactions and, accordingly, shall file such proposed redactions by September 22, 2016. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," Baystate Techs., Inc. v. Bowers, 283 Fed. App'x 808, 810 (Fed. Cir. 2008), the parties shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge